UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JERRY PERRY                                                                          Plaintiff

v.                                                        Civil Action No. 3:21-cv-00192-RGJ

NORTON HOSPITALS, INC.                                                      Defendant

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Defendant Norton Healthcare, Inc. ("Norton") moves for summary judgment on the claim of disability discrimination against it.  [DE 22]. [1]  Plaintiff Jerry Perry responded [DE 31], and Norton replied [DE 32].  Briefing is complete, and the matter is ripe.  For the reasons below, the Court **DENIES** Norton's Motion for Summary Judgment [DE 22].

## I.  BACKGROUND

A. Undisputed Facts

These facts appear to be undisputed based on the record and the parties' briefs.  Perry worked as a nurse at Audubon Hospital beginning in 1988.  During 2020, Perry worked as a registered nurse in Norton's Surgical Pre-Op Unit.  [DE 1 at 3; DE 22-1 at 55-56].  On July 20, 2020, Perry sent text messages to her supervisor, Seth Klockman ("Klockman"), requesting to "wear an N-95 mask," because of an autoimmune disease that made her more susceptible to infection and death from the COVID-19 pandemic.  [DE 1 at 3; DE 22-1 at 57-59; DE 22-8; DE 31 at 309].

---

[1] Although Counsel attached a Memorandum in support of their motion [DE 22-1], the Joint Local Rules for the Eastern and Western Districts of Kentucky contemplate a single, unified motion and memorandum. See Local Rule 7.1.  In the future, Counsel is advised to file a unified motion.

On July 21, while Norton evaluated Perry's request, Norton placed her on leave for eighteen days.  [DE 22-1 at 57; DE 31 at 311].

On July 22 and 23, at Norton's request, Perry submitted official accommodation request forms that she completed along with her doctors, dermatologist Dr. Jeffrey Callen ("Callen"), and primary care physician Dr. Jun Oh Kim ("Kim").  [DE 22-1 at 57; DE 22-9; DE 22-10; DE 31 at 312].  Callen treated Perry for her autoimmune disorder, while Kim did not.  [DE 22-4 at 85].

On July 29, Norton sent letters to Perry's physicians advising:

> As a RN in the Pre-Op Surgical Unit, Ms. Perry assesses, instructs and prepares patients before surgery by ensuring that operative and informed consents are signed and correct; taking and recording patient vitals; and reviewing patient medical history, initiating IV's and drawing labs, verifying pharmacy information, and administering any pre-op medication. Accordingly, Ms. Perry does not conduct or assist with aerosolized procedures, **which require the use of a N-95 mask**. If Ms. Perry were to be asked to assist with any aerosolized procedures, she would be given a N-95 mask like all other employees who assist with those procedures. While working, and like all other employees who are not conducting or assisting with aerosolized procedures, **Ms. Perry dons a surgical mask in accordance with Norton's universal mask protocol**.

[DE 22-11; DE 22-12] (emphasis added).  Thus, Norton required an N-95 mask for "aerosolized procedures" and required a surgical mask for all other employees not conducting aerosolized procedures "in accordance with Norton's universal mask protocol." *Id*.  The letter went on to advise that Perry "wear[ing] a N-95 mask at all times . . . is unreasonable and would pose an undue hardship on Norton . . ." *Id*.  Norton then advised of an alternative accommodation:  "Ms. Perry using a surgical mask and eye protection while working . . . Norton can offer Ms. Perry eye protection to wear . . ." *Id*. Norton asked Perry's physicians to let it know if the accommodation was sufficient. *Id*.

On August 3, Callen responded to Norton's letter agreeing with Norton's proposed accommodation:

2

August 3, 2020

Re: Jerry Perry ██████████

Dear Ms. Yadon:  Norton Healthcare

I have received and reviewed your letter regarding the use of the N95 mask for Mrs. Perry.  I think your response letter dated 7-29-20 is a reasonable one and I agree with you.

If you have further questions please let me know.

Sincerely,

Jeffrey P. Callen, MD

[DE 22-13].  That same day, August 3, Kim had a telephone call with Yadon and responded that in his medical opinion, Norton's proposal was inferior, and recommended Norton allow Perry to supply and wear her own N95 mask. [DE 22-14].  Kim's letter stated as follows:

> Thank you Nicole for returning my call earlier.
>
> Jerry Perry is a 67 year old lady with chronic hypertension and a medical condition requiring treatment with chronic immunosuppressive therapy which would invariably weaken her immune system making her more more vulnerable to the coronavirus that causes COVIb-19 infection. She is at high risk for serious complications including death should she contract this infection.
>
> She desires to enhance her protection against acquiring COVID-19 infection by wearing N95 or KN95 masks during work **which she will provide for herself** (she is not asking Norton Healthcare to provide this). In recent months the The Joint Committee as well as AMA have published statements supporting hospital employees to be able to provide their own protective PPE (such as N95 masks and KN95 masks) in cases where their employers are not able to provide for them**, I think it would be reasonable** for large healthcare systems such as Norton Healthcare to consider individual circumstances and allow **Jerry Perry to provide herself with her own N95 or KN95 masks**. This in no way is contrary to any CDC guidelines that have been established. The alternative of wearing a regular surgical mask and face shield would in my medical opinion be Inferior to wearing an N95/KN95 (with or without a face shield).

3

Thank you for this special consideration for your valued employee who has committed many years of her professional service to Norton Healthcare.

[DE 22-14] (emphasis added).

On August 6, Norton sent Perry a letter via email with the same conclusion—it would not provide her with an N95 mask but would provide a surgical mask and eye protection.  [DE 22-15]. Norton further advised "Norton cannot allow you to bring a personal N-95 mask from home to work because it cannot verify or authenticate the effectiveness of its use." *Id*.  Norton then offered her another alternative to the surgical mask and eye protection: "Norton would like to offer you the following accommodation:  to continue working as an RN, but for the Norton Command Center . . . at your existing schedule and pay." *Id*.  Norton required Perry to advise whether she would accept by the close of business the next day, August 7. *Id*.

The next day, August 7, which was the deadline for accepting Norton's accommodation, Perry sent a letter to Yadon informing her "that I will be retiring effective August 7, 2020."   DE 22-16].  The letter stated as follows:

This is to inform you that I will be retiring effective August 7, 2020. The timing of this retirement was not of my choosing. I am deeply saddened by the circumstances that have prevented me from continuing to work at my chosen profession. I have worked at Audubon since November, 1988. I always took great pride in my work, and was a loyal and dedicated employee. Yes, there would have been a time when I eventually would have retired, but I always thought I would be free to decide that time. From my perspective, the freedom to decide both if and when has been taken from me. I suppose you may say I still have that freedom, and that I am exercising it with this letter, but I have been left with no choice but to retire. Yes, I was offered a temporary position, but it is not a position that would utilize my nursing knowledge and years of experience. I would not have the same sense of pride and satisfaction as I did before.

I am angered by the fact that a seemingly simple request by my doctors became such a major issue, and that I was immediately "punished" by being placed on leave without pay, when I had done nothing wrong. The fact that the situation was made to last 18 days is apparently what happens when lawyers (rather than educated and trained medical personnel) are allowed to make decisions that affect both the safety and the livelihood of medical workers. Those eighteen (18) days have been terrible

for my overall health ( lack of sleep, depression, etc), but based on what has occurred in my case, it appears that the health of any employee may be irrelevant.

I both feel sorry for and worry about the nurses left in surgery pre-op. Since more and more patients are arriving for surgery without being tested for the COVID virus (or their tests results are not available), the nurses are now potentially more exposed than ever before, and based on Norton policy, have no allowance to use a higher level of protection. It is just a matter of time before a nurse gets the virus, and perhaps worse. It is a sad day when protecting the organization is more important than protecting the employees that make up that organization.

[DE 22-16].

On August 10, Norton sent Perry a letter via email stating that Norton would have preferred she "continue working with Norton by accepting our proposed accommodation of working at Norton's COVID-19 Command Center." [DE 22-17].  The letter stated as follows:

While we would have preferred that you continue working with Notion by accepting our proposed accommodation of working at Norton's COVID-19 Command Center in your same position as a registered nurse with the same pay and schedule, we accept your decision to retire effective August 7, 2020.[1] We are sorry to hear the concerns that you expressed in your August 7, 2020, letter.

As you are aware, Norton follows the infection prevention and control guidelines issued by the Centers for Disease Control ("CDC") and is committed to ensuring the safety of all of its employees while it operates during the COVID-19 pandemic. As you know, Norton screens and triages everyone who enters Norton's facilities for signs and symptoms of COVID-19 (e.g. actively taking their temperatures; asking whether individuals have been advised to self-quarantine because of exposure to COVID-19 when necessary, etc.). Further, Norton has followed the CDC's recommendation to use its personal protective equipment-specifically its N-95 masks judiciously so as to optimize its supply during the pandemic. Additionally, **Norton implemented its universal mask protocol** and encouraged social distancing since spring of 2020 and continues to follow CDC guidelines when treating suspected or positive COVID-19 patients.

. . .

We thank you for your many years of service to Norton and the value you brought to our organization. While we had hoped you would continue working with us we certainly understand and respect your decision to retire. Again, thank you for your work for Norton and we wish you the best in your future endeavors.

[DE 22-17] (emphasis added).

Perry testified in depositions that she witnessed other registered nurses in her department bringing their own N95 masks and wearing N95 masks at work during the COVID-19 pandemic, and that Norton did not attempt to verify the effectiveness of these masks.  [DE 31 at 318-21].  She also submitted declarations in support of this contention.  [*Id.*].

In March 2021, Perry sued Norton for a single count of disability discrimination, alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") and the Kentucky Civil Rights Act, K.R.S. 344.040 ("KCRA").  [DE 1].

B. Disputed Facts

In her response brief, Perry disputes or seeks to clarify various facts set forth by Norton in its motion for summary judgment.  The Court addresses those arguments below, before addressing the merits of the summary judgment motion.

Perry contends that her leave was unpaid, while Norton asserts such leave was paid.  [DE 22-1 at 57; DE 31 at 311].  Perry points to her own letter and Yadon's deposition that supports that Perry's leave was unpaid.  [DE 22-7 at 118; DE 22-16 at 147].  Norton points to no evidence that supports Perry's leave was paid.  [DE 22-1 at 57-58].  Thus, there is no genuine factual dispute as to whether Perry's leave was unpaid at the summary judgment stage.  The Court considers Perry's leave was unpaid for purposes of this motion.

Perry disputes whether Norton was following CDC guidance. Norton states that it followed CDC guidance on masking within its facilities during the COVID-19 pandemic, including the guidance that healthcare workers wear face masks at all times while in their facilities, and N95 masks for aerosol generating procedures and surgical procedures that might pose higher risk for COVID-19 transmission.  [DE 22-1 at 56; DE 26 at 264; DE 31 at 313].  Perry contends that the CDC issued guidance on March 14, 2020 relaxing its "fit testing" requirements for N95 masks and

suggesting alternatives for employers to provide that were equal to an N95 during non-aerosolized care of patients.  [DE 31 at 314].  Perry then contends that in April 2020, the CDC guidance allowed use and extended use of N95 masks and expired N95 masks and then also allowed for voluntary use of respiratory protection in employment. *Id*.  Whether Norton followed CDC guidance is a dispute of fact not appropriate for resolution at summary judgment.

Perry seeks to clarify Norton's statement that "Perry did not conduct or assist in any procedures involving aerosols or other processes."  [DE 22-1 at 56; DE 31 at 310].  Norton cited Perry's job description and both Perry and Yadon's deposition in support.  [DE 22-1 at 55-56]. Perry argues that Yadon admitted Perry was in a patient facing role, that Perry regularly treated COVID-19 patients, and that Norton does not define "procedure involving aerosols," and Perry agreed in her deposition that she did not conduct or assist in any procedures involving aerosols and submits no evidence to the contrary.  [DE 22-1 at 56; DE 22-4 at 88-89].  Perry contends and Nichole Yadon ("Yadon"), Norton's Employee Relations Manager, agrees, that Perry's Pre-Op job was "patient facing."  [DE 31 at 310; DE 31-2 at 367].  The Court does not see this as a dispute that needs to be resolved at this phase and understands that even though Perry did not participate in aerosolized procedures, she came into contact with people in her job.

The parties dispute whether Perry informed her supervisor of her disability when she was diagnosed in 2016.  [DE 31 at 310].  In support, Perry cites her deposition testimony that she informed her supervisor in 2016 of her disability when she was diagnosed and selected text messages, some from 2020 and some undated, discussing wearing an N95 mask.  [*Id.*; DE 31-1 at 355, 365; DE 31-3].  Norton cites no evidence in support of its contention that Perry never reported she suffered from a disability or requested an accommodation for such.  [DE 22-1 at 55-56].  But "the defendant generally has no obligation to present documentation to prove a negative." *Bunt v.*

*Clarksville Montgomery Cnty. Sch. Sys.*, No. 3:19-CV-01013, 2021 WL 1264431, at *12 (M.D. Tenn. Apr. 6, 2021). This is a credibility determination and thus a genuine factual dispute that would be inappropriate to resolve at the summary judgment stage. The Court therefore draws all reasonable inferences in a light most favorable to the nonmoving party, and proceeds with its analysis assuming that Perry informed her supervisor or her disability in 2016. It is also debatable whether it mattered whether Perry notified Norton of her autoimmune disorder before the COVID-19 pandemic in 2020.

Perry disputes Norton's statement that she worked without an N95 mask during the first five months of the COVID-19 pandemic without complaint. [DE 22-1 at 56; DE 31 at 310]. Perry admits that she did not complain or request an N95 mask until July 2020. [DE 1 at 3; DE 31 at 310-11]. Citing her deposition and payroll records, Perry states that early during COVID-19 "like every other day we stayed home" and that she requested an N95 mask when Norton began reopening its schedule to include more surgeries, and thus more exposure to patients and visitors with unknown COVID-19 statuses. [DE 31 at 310-11; 31-1 at 339; 31-4]. Norton cites no evidence to dispute this. [*See* DE 22; DE 32]. Thus, there is no genuine factual dispute that would be inappropriate to resolve at the summary judgment stage. The Court therefore proceeds with its analysis assuming that Perry did not request an N95 mask until July 2020 because Norton began reopening its schedule, and Perry was exposed to patients and visitors with unknown COVID-19 statuses.

Perry disputes Norton's statement that her doctor suggested she retire from her position "in addition" to his recommendation that she wear an N95 mask. [DE 31 at 311]. Perry contends that she was advised to wear an N95 mask "or" retire, and cites her deposition and her texts sent to a supervisor that her doctor "really wanted [her] to retire." [DE 22-4 at 97-98; DE 22-8; DE 31 at

311].  Norton does not dispute this.  Thus, there is no genuine factual dispute that would be inappropriate to resolve at the summary judgment stage.  The Court therefore proceeds with its analysis assuming Perry's doctor suggested she wear an N95 mask or retire.

Perry also disputes whether there was a nursing shortage the day after she requested to wear an N95 mask.  [DE 31 at 312].  Norton contends that after Perry texted her accommodations request to her supervisor Klockman, he asked her to submit her request formally and he would submit it to Human Resources, and that Yadon advised Perry should wear an N95 mask to complete her shift on July 21, 2020 to avoid a staffing shortage.  [DE 22-1 at 57].  Perry argues that there is no evidence there was a staffing shortage that day, and that Yadon stated Perry should "go ahead and wear [an N95 mask] today and she feels like this is an accommodations we can approve."  [DE 31 at 312; DE 31-2 at 370-71; DE 31-3].  The parties dispute the interpretation of this statement; Perry argues that Yadon meant that Perry's N95 request could be accommodated going forward, while Norton argues that Yadon meant Perry was only allowed to wear an N95 mask for the one day.  [DE 22-1 at 57; DE 31 at 312].  Perry points to her text messages with Klockman and both parties point to Yadon's deposition, in which Yadon states that she meant only that Perry should wear an N95 mask for one day.  [DE 22-1 at 57; DE 31 at 312; 31-2 at 370-71; DE 31-3].  Thus, there are genuine factual disputes that would be inappropriate to resolve at the summary judgment stage.  The Court therefore proceeds with its analysis assuming that there was no staffing shortage that day, and that Yadon intended that Perry's N95 mask request could thereinafter be accommodated.

Norton emphasizes the language in Perry's accommodation request that she "had no impairment to limit [her] ability to perform fact functions of [her] job." The parties dispute where the language on Perry's accommodation request stating she "had no impairment to limit [her]

9

ability to perform fact functions of [her] job" came from.  Perry contends that Yadon told her to "change" the language on her form to state she had "no impairment to limit [her] ability to perform fact functions of [her] job."  [DE 31 at 312].  Norton's evidence does not contradict that Yadon told Perry to change the language.  [*See* DE 22].  Thus, there is no genuine factual dispute that would be inappropriate to resolve at the summary judgment stage.  The Court therefore proceeds with its analysis assuming that Yadon told Perry to change the language on her form.

Perry seeks to clarify that Callen noted it was "preferable," rather than required or necessary, to wear an N95 mask.  [DE 31 at 312].  Perry cites to her accommodations form, where Callen checked "no," on the question "can the employee currently perform all of the essential functions of her/his position stated in the attached job description?"  [DE 22-9 at 124].  But this does not directly dispute the evidence of Callen's written statement on the same form that "[i]t is preferable for [Perry] to wear an N-95 mask and eye shield while in contact with patients or staff." [DE 22-1 at 57; DE 22-9 at 124].  The Court understands what Callen indicated on the form. There is no genuine factual dispute that would be inappropriate to resolve at the summary judgment stage. The Court therefore proceeds with its analysis with the assumptions that Callen checked "no" on the above question and that he stated it was "preferable" for Perry to wear an N95 mask.

Similarly, Perry disputes Norton's assertion Perry could "perform all of the essential functions of her/his position contained in her job description without an accommodation."  [DE 31 at 313].  Norton cites the completed accommodation form filled in by Perry's general practitioner, Kim, indicating Perry's ability to perform the essential functions of her position without accommodation.  [22 at 57-58; DE 22-10].  Perry, however, notes that Kim also selected "yes" and wrote "KN95/N95 at work" when asked "if the employee cannot perform the essential functions of her . . . position, is there an accommodation that Norton could make at this time to enable the

employee to perform her . . . job." [DE 31 at 313]. The accommodation form cited supports both that Perry could perform her job without an accommodation and that Kim selected yes and wrote "KN95/N95 at work" in the box asking, "if the employee cannot perform the essential functions . . . is there an accommodation that Norton could make?" [DE 22-10 at 131]. The responses on the form have an ambiguity that create an issue of fact. Taken in the light most favorable to Perry for purposes of summary judgment, the Court proceeds as if Kim did not opine that Perry could complete her job duties without an N-95 mask.

Perry also disputes Norton's statement that Perry "does not assist with procedures—nor is in situations which—necessitate the use of an N-95 mask." [DE 22-1 at 58; DE 31 at 313]. Norton cited Yadon's letters in support. [DE 22-1 at 58]. Perry cites Yadon's statement that, "[w]hile working, and like all other employees who are not conducting or assisting with aerosolized procedures, Ms. Perry dons a surgical mask in accordance with Norton's universal mask protocol." [DE 31 at 313]. Perry argues that "Norton has admitted that it does not maintain a 'universal mask protocol' or any other policy but has instead adopted CDC guidelines as its policy." [*Id.*]. Norton does not dispute this. The parties agree that Perry was working as a Pre-Op surgical nurse when she requested her accommodation and that this job meant she did not assist in "procedures" involving aerosols. [*See* DE 22-1 at 55-56; DE 31 at 310; DE 22-4 at 88-89]. However, Perry argues that she was regularly exposed to and required to treat COVID-19 patients because sometimes patients would not have their COVID-19 tests back before going to surgery and would later come back positive. [[DE 31 at 310; DE 31-1 at 347]. When asked specifically if she was ever around COVID-19 positive people, she answered that once she had to treat a patient who was COVID-19 positive, at which point she was given a mask. [DE 31-1 at 364-65]. The issue is

whether Perry's work necessitated use of N-95 mask in light of her medical condition.  That is a factual dispute the Court cannot resolve on Summary Judgment.

Next Perry disputes that Callen, in his August 3, 2020 letter, "opined that Norton's proposed accommodation of a surgical mask and protective eye wear was a 'reasonable one[,]' adding that he 'agree[d] with [Norton]."  [DE 22-1 at 58; DE 31 at 313].  Perry argues Callen's letter is unclear, does not specify what Callen agreed to, and instead states only "I have received and reviewed your letter regarding the use of the N95 mask for Mrs. Perry.  I think your response letter dated 7-29-20 is a reasonable one and I agree with you."  [DE 22-13; DE 31 at 313].  Norton attached two letters: Yadon's letter to Callen dated July 29, 2020, and Callen's letter to Yadon dated August 3, 2020.  [DE 22-11; DE 22-13].  Yadon's July 29 letter to Callen outlines Norton's proposed accommodation of "Perry donning a surgical mask and eye protection."  [DE 22-1 at 58-59; DE 22-11 at 133-34].  Perry argues that argues it "could it be that Callen agreed with Yadon's questioning of Perry's need to wear an N95 at work, that Yadon had no knowledge or expertise to support what was included and may have misled Callen in her letter, that Callen was on vacation so it is unclear if he fully read Yadon's letter, and that Yadon said Callen's letter "created a conflict."  [DE 31 at 313-14].  These arguments go to the credibility of Callen's letter and are issues not appropriate for the Court to resolved on summary judgment and the Court draws all reasonable inferences in Perry's favor.

Perry also disputes Norton's assertion that it "advised Perry that she could not bring her own N-95 marks "from home to work because [it could not] verify or authenticate the effectiveness of its use."  [DE 31 at 314-15].  Perry appears to dispute the reason Norton denied her request.  [*Id.*].  In support, Norton cites a letter from Yadon to Perry stating that Norton would not allow her to bring her own N95 mask because Norton could not "verify or authenticate the effectiveness

12

of its use."  [DE 22-15 at 144-145].  Perry argues that "CDC guidelines, which were Norton's admitted policies at the time, permitted the voluntary use of previously used, reused, and expired N95's and did not require employers to test or authenticate the effectiveness of said N95's."  [DE 31 at 314-15].  She cites a letter from Kim stating that Perry bringing her own N95 mask would not contradict CDC guidelines and Yadon's testimony that the Employee Health Department made the decision to not allow Perry to bring her own mask.  [*Id.*].  As evidence cited from the parties support both arguments, the Court draws all reasonable inferences in a light most favorable to the nonmoving party.  Thus, the Court proceeds with its analysis assuming that CDC guidelines permitted Perry's voluntary use of an N95 mask.  Perry also argues, again citing Yadon's testimony, that the decision to not allow her to bring a mask was made "without consulting said guidelines," but this is not directly supported by Yadon's testimony, and the Court will not proceed with this factual assumption.  [DE 31 at 315; DE 31-2 at 378-80].

Perry also disputes Norton's offered accommodation to work at the Command Center. Perry contends that even with the accommodation she still would have been near patients and staff without the ability to wear an N95 mask, and that the accommodation would have been temporary. [DE 31 at 315-16].  Perry cites Callen's note stating, "[i]t is preferable for her to wear an N-95 mask and eye shield while in contact with patients or staff."  [DE 22-9 at 124; DE 31 at 315-16]. In support of her argument that the position with the Command Center was temporary, Perry cites the fact that the Center was later closed in October or November 2021.  [DE 31 at 316].  Yandon's testimony cited by Perry is consistent that the Command Center position was intended to be temporary allowing Perry to return to her original position after COVID-19 and that all positions outside the Command Center were patient facing.  [DE 31-2 at 383-85].  None of Perry's factual

13

assertions appear discordant with Norton's. Thus, there is no genuine factual dispute over these facts that would be inappropriate to resolve at the summary judgment stage.

Finally, Perry disputes Norton's statement that Perry "abruptly resigned" from Norton. [DE 22-1 at 60; DE 31 at 316-17]. Norton cites Perry's retirement letter to Yadon in which she stated in the "[t]his is to inform you that I will be retiring. . . [in] the temporary position [in the Command Center] . . . I would not have the same sense of pride and satisfaction." [DE 22-16 at 147]. Perry contends that it was not her "choice," and cites the lack of an effective accommodation, citing the same letter stating among other things that she "was left with no choice but to retire," resulting in constructive discharge. [DE 22-16 at 147; DE 31 at 317]. The Court does find factual dispute around this statement given use of the word "abrupt." Norton informed Perry that she had to respond to their accommodation by the close of the next day. Whether she "abruptly" resigned is a factual dispute and not appropriate to be resolved here. The Court discusses this allegation of constructive discharge in greater detail below.

## II.    STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion. *Id.* at 252.

14

The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

Rule 56(c)(1) requires that a "party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

**A. Discrimination Claim**

Perry alleges Norton discriminated against her based on her disability. [DE 1]. Norton has moved for summary judgment on this count. [DE 22]. Perry argues that there are issues of fact for the jury to resolve. [DE 31]. Norton argues that this count should be dismissed because Perry cannot prove she had a disability or Norton's awareness of her disability, because Norton engaged in the interactive process and offered her a reasonable accommodation, and because Perry resigned from her employment and suffered no adverse employment action. [DE 22-1].

The language of the KCRA mirrors that of federal anti-discrimination law, and courts have interpreted the KCRA consistently. *See Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003); *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 520 (6th Cir. 1998). Therefore, the Court will analyze Plaintiff's KCRA claims under the framework provided by the ADA. Disability discrimination claimants can proceed under the separate legal theories of disparate treatment and failure to accommodate. The two theories have overlapping elements and may be asserted in the alternative, as Perry has here. *See Webb v. Humana Inc.*, 819 F. Supp. 2d 641, 644–45 (W.D. Ky. 2011).

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discriminating "on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). It is considered discrimination where a covered entity "den[ies] employment opportunities to a[n] . . . employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(B).

Disability discrimination and failure to accommodate claims can be asserted under either direct or indirect evidence theories. "Claims that allege a failure to accommodate 'necessarily involve direct evidence.'" *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)).

An accommodations claim based on direct evidence is analyzed under the following framework:

> (1) The plaintiff bears the burden of establishing that he or she is disabled.
> (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability:
>> (a) without accommodation from the employer;
>> (b) with an alleged "essential" job requirement eliminated; or
>> (c) with a proposed reasonable accommodation.
> (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Kleiber*, 485 F.3d at 869 (citing *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)).

Direct evidence requires no inference to conclude that the employer discriminated, and thus typically involves a written or spoken comment by the employee explicitly stating the employer discriminated because of the employee's disability. *Kleiber*, 485 F.3d at 868–69; *see also Ross v. Campbell Soup Co.*, 237 F.3d 701, 706–07 (6th Cir. 2001). "An employer will be entitled to judgment if a Plaintiff fails to establish that [they] requested and [were] denied a reasonable accommodation, as the employer has no duty to provide a reasonable accommodation absent such a request." *Day v. Nat'l Elec. Contractors Ass'n*, 91 F. Supp. 3d 1008, 1015 (S.D. Ohio 2015).

A disparate treatment claim is evaluated under an indirect evidence standard. *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 614 (6th Cir. 2020). A prima facie case for Perry's disability discrimination claim based on disparate treatment requires a showing that: (1) she is disabled; (2) otherwise qualified for the position; (3) she suffered from an adverse employment decision; (4) the employer knew or had reason to know of her disability; and that (5) similarly situated non-protected employees were treated more favorably. *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999); *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).

*1. Disability—Accommodation and Disparate Treatment Claims*

Under both her failure to accommodate and disparate treatment theories, Perry must first establish that she was disabled.  As the ADA and KCRA differ in their definitions of "disability," the Court will consider both statutes here.

Under the ADA, as amended in 2008, disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of [the] individual," or "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see also Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1106–07 (6th Cir. 2008).  The statute defines "major life activities" in "general" as "include[ing], but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A). The statute specifies that "Major Life Activates," also includes "major bodily functions" which include "**functions of the immune system** . . ." 42 U.S.C. § 12102(2)(B) (emphasis added). "In deciding whether an individual is substantially limited in a major life activity, courts should consider the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or expected permanent or long term impact, of the impairment."  *Penny v. United Parcel Serv.*, 128 F.3d 408, 414 (6th Cir. 1997).   A few courts have adopted a "totality of the circumstances" approach when applying the ADA in light of COVID-19.  *See, e.g.*, *Silver v. City of Alexandria*, 470 F. Supp. 3d 616, 622 (W.D. La. 2020) (finding plaintiff's inoperable aortic valve disease, systolic heart failure, and permanent pacemaker made him more susceptible to contracting COVID-19 and qualified as a disability during COVID-19); and *Frederick v. Allor Mfg., Inc.*, No. 220CV12790TGBRSW, 2022 WL 598746 (E.D. Mich. Feb. 28, 2022) (also

18

employing totality of the circumstances during COVID-19).  Under this approach, Courts consider an individual's heath circumstances in the context of COVID-19.  *Silver*, 470 F. Supp. 3d at 622; *Frederick*, 2022 WL 598746, at *5.

The KCRA still follows the pre-2008 ADA's definition of disability: "(a) a physical or mental impairment that substantially limits one (1) or more of the major life activities of the individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment."  K.R.S. § 344.010(4); *see also Larison v. Home of the Innocents*, 551 S.W.3d 36, 43 (Ky. App. 2018); *and Grainger v. Hoskin & Muir, Inc.*, No. 3:19-CV-00347-GNS, 2019 WL 6684524, at *4–5 (W.D. Ky. Dec. 6, 2019).  An impairment substantially limits an individual if it renders them "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii)[s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity."  *Kiphart v. Saturn Corp.*, 251 F.3d 573, 582 (6th Cir. 2001) (citing 29 C.F.R. § 1630.2(j)(1) (2000)).  Major life activities include "those basic activities that the average person in the general population can perform with little or no difficulty," such as walking, seeing, hearing, lifting, caring for oneself, and working, among others.  *Id.* (citation omitted).

Comparing the ADA and KCRA definitions, the KCRA standard is narrower; a plaintiff bringing a claim under the KCRA does not benefit from the expanded protections of the ADA.  *See Grainger*, 2019 WL 6684524, at *5 ("plaintiffs bringing a claim under the KCRA do not receive the benefits of an expanded definition of disability [under the ADA] . . . the standard for what constitutes a disability under the KCRA is admittedly narrower than the revised standard of the" ADA).

Perry contends her autoimmune disorder substantially limited a "major life activity." [DE 31 at 323-25]. Perry states that she was placed on immunosuppressant medication and argues that she is disabled because "major life activities" under 42 U.S.C. 12102(1) expressly include "breathing" and "[t]he operation of a major bodily function, including but not limited to, functions of the immune system" and supports her argument with medical records. [DE 31 at 317-25].[2] Perry cites CDC guidelines that individuals with the condition "Immunocompromised state (weakened immune system) from . . . use of other immune weakening medicines" "might be at an increased risk" of COVID-19 complications. [DE 31 at 324 (citing People Who Are at Higher Risk for Severe Illness | Coronavirus | COVID-19, CDC, https://web.archive.org/web/20200625180132/https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited March 15, 2023))]. Perry also cites *Silver*, 470 F. Supp. 3d at 622 in support of a 'totality of the circumstances during COVID-19' approach. Norton argues Perry is not disabled because her autoimmune disorder did not "impair her ability to engage in any major life activity or limit her in performing any function of her job with Norton." [DE 22-1 at 64; DE 32 at 595-99].

The Court is satisfied from the record that Perry's autoimmune disorder constitutes an impairment that impacted a major life activity, working, and a major bodily function, her immune system. Norton does not dispute these elements of a disability in its briefing on the motion for summary judgment. But whether Perry's autoimmune disorder (the impairment) substantially limited a major life activity (work) or major bodily function (the immune system) is what is in dispute and is a question of fact for the jury. *Kesler v. Barris, Sott, Denn & Driker*, PLLC, No.

---

[2] The Court notes that Perry cites to her exhibits as lettered, but that Perry's exhibits were not labeled other than ECF's default numerical labels. [*See generally* DE 31 and attachments]. The Court assumes Perry's citations to her own "Exhibit A" references DE 31-1 and so on.

CIV. 04-40235, 2008 WL 1766667, at *17 (E.D. Mich. Apr. 17, 2008). It is possible that Perry's immunosuppressed state restricted her ability to work under the circumstances because she was more susceptible to COVID-19, due to the medication she had to take for her condition, which suppressed her immune system making her more susceptible to viruses and illness. Whether Perry was no longer able to do her job without an N95 because she was immunocompromised because of her medication is a jury question. Because work is a major life activity and considering a totality of the circumstances during COVID-19, Perry has pointed to sufficient evidence that her autoimmune disorder substantially limits a major life activity. *See Tomlinson v. Krauss-Maffei Corp.*, No. 2:19-CV-69 (WOB), 2021 WL 5830017, at *5 (E.D. Ky. Dec. 8, 2021) ("work is a major life activity"), *aff'd*, No. 21-6245, 2023 WL 1777389 (6th Cir. Feb. 6, 2023). Also, whether Perry was "regarded as" disabled by Norton likewise involves question of fact not appropriate to be resolved on summary judgment. The Court finds that whether Perry was disabled is a question for the jury and assumes for the purposes of this motion that Perry is disabled under the ADA and KCRA.

### 2. Reasonable Accommodation, "otherwise qualified," or the Interactive Accommodation Process—Accommodations Claim

It is Perry's burden to first establish that she "requested and was denied" a reasonable accommodation. *Lockard v. Gen. Motors Corp.*, 52 Fed. App'x 782, 786 (6th Cir. 2002). The plaintiff's burden at this step includes showing both that they proposed an accommodation and that the proposed accommodation was reasonable. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010) (citation omitted). The parties do not develop arguments on either of these questions, and it appears that these elements are undisputed; thus, the Court does not analyze them and turns to the question of the interactive process.

At issue and disputed by the parties is whether Norton properly engaged in the Interactive Accommodation Process.  [DE 31 at 325; DE 32 at 599-603].  Upon request for reasonable accommodation, plaintiff triggers "an informal, interactive process with the individual with a disability in need of the accommodation."  29 C.F.R. § 1630.2(o)(3).  In the Sixth Circuit, the informal, interactive process is mandatory.  *Lafata v. Church of Christ Home for Aged*, 325 Fed. App'x 416, 422 (6th Cir. 2009) (quoting *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 556 (6th Cir. 2008)).  Accordingly, "[p]arties should not obstruct the process, or refuse to participate" in good faith, *Jakubowski*, 627 F.3d at 202, and ought to participate directly with each other.  *Kleiber*, 485 F.3d at 871.

If the employer fails to participate in good faith, it faces liability under the ADA if a reasonable accommodation would have been possible.  *Lafata*, 325 Fed.Appx. at 422 (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391 (2002)).  On the other hand, when the employer engages with an employee who refuses to participate in good faith or withholds essential information, the employer cannot be liable under the ADA for failure to accommodate.  *Wells v. Chrysler Grp., LLC*, No. 3:08CV2264, 2013 WL 2631371, at *6 (N.D.Ohio June 11, 2013); *see also Kleiber v. Honda of Am. Mfg. Inc.*, 420 F.Supp.2d 809, 828 (S.D.Ohio 2006) ("An employer cannot be found to have violated the ADA when responsibility for the breakdown in the informal interactive process is traceable to the employee and not the employer."), *aff'd* 485 F.3d 862 (6th Cir. 2007).

Though the employer need not "propose a counter accommodation in order to participate in the interactive process in good faith[,]" doing so "may be additional evidence of good faith." *Jakubowski*, 627 F.3d at 203 (citations omitted).  Meeting with the employee, discussing reasonable accommodations, and suggesting other possible positions for the employee satisfies the

22

requirement of good faith participation.  *Id.* It behooves an employer to propose a reasonable accommodation—an employee "cannot force [his] employer to provide a specific accommodation if the employer offers another reasonable accommodation."  Talley, 542 F.3d at 1108 (citing *Hedrick*, 355 F.3d at 457.  An employee who rejects a proposed reasonable accommodation "is no longer considered a 'qualified individual with a disability.'"  *Hedrick*, 355 F.3d at 457.

Here, there is evidence that Norton considered Perry's request and proposed accommodations and information from her doctors.  Norton informed Perry why it could not or would not accommodate her request to wear the N95 and offered her a position at the Command Center.  Perry disputes that this was done in good faith and points to various factual issues in support of her argument as discussed above under the facts sections. There are thus genuine disputes of fact that prevent summary judgment on this issue. And whether Norton's proposed accommodations – the surgical mask plus eye protection or working at the Command Center, which Perry rejected, were reasonable accommodations also requires resolving factual disputes. "[W]hether Defendant's offering was a reasonable accommodation is clearly within the purview of the jury." *Meachem v. Memphis Light, Gas & Water Div*., 119 F. Supp. 3d 807, 818 (W.D. Tenn. 2015).  Thus the Court cannot grant Norton summary judgment on this issue of whether it participated in good faith.

### 3.  *Undue Hardship—Accommodations Claim*

The parties also dispute whether Perry's requested accommodation was an undue hardship. [DE 31 at 325; DE 32 at 601].  It is Norton's burden to demonstrate that Perry's requested accommodation would be an undue hardship.  *Cleveland v. Fed. Express Corp.*, 83 F. App'x 74, 79 (6th Cir. 2003).  Perry does not argue that Norton's refusal to provide her with an N95 mask would not have caused an undue hardship.  Indeed, if that were the only requested accommodation

at issue it would not be a close call that it would create an undue hardship.  Instead, Perry's discusses how Norton's failure to allow Perry to purchase and bring her own N95 mask to work did not create an undue hardship.  [DE 31 at 325-28].  The Court thus specifically considers only this allegation, and not whether Norton's failure to provide Perry with an N95 mask was an undue hardship during the COVID-19 pandemic.  *See Rouse v. Caruso*, No. 06-CV-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011), *report and recommendation adopted,* No. 06-CV-10961, 2011 WL 893216 (E.D. Mich. Mar. 14, 2011) ("It is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

The ADA provides factors to consider in "determining whether an accommodation would impose an undue hardship":

(i)     the nature and cost of the accommodation needed under this chapter;

(ii)    the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii)   the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv)    the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10)(B).

Here, Perry's request to wear her own N95 mask does not implicate factors (i), (ii), (iii) or (iv) on their face. 42 U.S.C. § 12111(10)(B).

Norton argues that allowing additional unnecessary individuals—Perry specifically—to wear an N95 mask provided by Perry, would place additional strain on the supply chain by purchasing N95 masks outside proper channels, would be an undue burden in this situation, where

24

N95 masks were in short supply during COVID-19.  The Sixth Circuit has held that a proposed accommodation that could have an adverse impact on other employees' seniority under a collective bargaining agreement would cause that the employer would suffer an undue hardship in attempting to make that accommodation. *See e.g. Virts v. Consol. Freightways Corp. of Delaware*, 285 F.3d 508, 520–21 (6th Cir. 2002) (Sixth Circuit precedent "clearly shows that [d]efendant would suffer an undue hardship in attempting to accommodate" a plaintiff where it would likely adversely affect defendant's other employees).  Norton has not argued and there is an insufficient record for the Court to find that allowing Perry to wear her own N95 would adversely impact other employees of Norton by reducing the supply of available N95s.  And ultimately although that argument feels to remote to qualify as an undue hardship to Norton under this case, whether allowing Perry to wear her own N95 mask would create an undue hardship to Norton is a jury question.

Viewing the facts and inferences in the light most favorable to the nonmoving party, the Court **DENIES** summary judgment on Perry's disability discrimination accommodation claim.

### 4.  *Adverse Employment Decision—Disparate Treatment Claim*

Perry also bears the burden of showing that she suffered an adverse employment decision with respect to her disparate treatment claim.

The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms and conditions of plaintiff's employment." *E.E.O.C. v. SunDance Rehab. Corp.*, 466 F.3d 490, 501 (6th Cir. 2006) (internal quotation omitted).  "Examples of adverse employment actions include firing, failure to promote, reassignment with significantly lower responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation." *Id.* (quoting *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575–76 (6th Cir. 2004).  This Court looks to whether a particular employment action was "objectively intolerable to a reasonable

person," rather than an individual's subjective impressions, to determine whether an employment action was materially adverse. *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002). "In short, the action must have a 'significant detrimental effect' on the employee's status as evidenced by objective factors, not subjective impressions." *Freeman v. Potter*, 200 F. App'x 439, 442–43 (6th Cir. 2006) (internal quotation omitted).  This standard filters out claims establishing merely a "bruised ego" or a "mere inconvenience." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 802 (6th Cir. 2004), *aff'd,* 548 U.S. 53 (2006).

Perry argues that she suffered such because the failure to accommodate her was a constructive discharge.  [DE 31 at 328-29].  Norton argues that Perry voluntarily left after her physician's recommendation.  [DE 22-1 at 67-68].

Constructive discharge constitutes an adverse employment action. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001).  To demonstrate a constructive discharge, a plaintiff must provide evidence showing (1) that the employer deliberately created intolerable working conditions as perceived by a reasonable person; and (2) that the employer did so with the intent of forcing the employee to quit. *Id.* at 568–69.

The Sixth Circuit has adopted seven factors that a court should consider for purposes of satisfying the first prong of this inquiry:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 569.

Here, there was no demotion or reduction in salary.  Perry argues that she was subjected to an "objectively intolerable workplace" due to "possible death, only furthered by Norton's

intentional and without basis denial of Perry purchasing and using her own N59." [DE 31 at 329].

Norton argues that Perry's argument is that she quit "in apprehension that conditions may

deteriorate." [DE 32 at 603].  Although Norton denied her specific requested accommodation, it

offered Perry a new position at the Command Center or added protection in the form of a face

shield.  [DE 22-1 at 59; DE 31 at 309, 316-17].  But it is not clear whether Perry could have worn

her own N95 at the Command Center.  Perry testified in her deposition that she would have been

around other staff at the Command Center and that she would have needed to wear an N95 mask,

and that is another reason why she did not accept the Command Center position. [DE 31-1 at 345-

56].  Norton argues that Perry never discussed with Norton whether she could wear her own N95

mask at the Command Center.  Norton argues Perry resigned without discussing this issue with

Norton, but does not state that it would have permitted Perry to wear her own N95 at the Command

Center.  And Norton's letter gave Perry by the close of business the following day to accept the

Command Center position. [DE 22-15].  Perry also mentioned in her resignation letter that she

would not have the same sense of pride and satisfaction at the Command Center.

Taking the facts and inferences in a light most favorable to Perry, there is a genuine dispute

as to material fact as to whether Perry suffered an adverse employment decision, and therefore

Court **DENIES** summary judgment on Perry's disabilities discrimination disparate treatment claim

as it relates to whether an adverse employment decision occurred.

### 5.  *Similarly Situated Employees' Treatment–Disparate Treatment Claim*

Finally, Norton argues that Perry's disparate treatment theory fails because Perry cannot

identify an employee who was treated more favorably. In response, Perry submits evidence that

three Norton employees were treated differently than her. [DE 31-10, Martin Declaration, DE 31-

11 Wehder Declaration, DE 31-13, Barber Declaration].  Norton argues these witnesses were not

timely disclosed by Perry. But this argument is made by Norton in its reply brief. [DE 32 at 598]. The Court does not have the benefit of a response from Perry and Perry alleges in her response that the parties have a discovery dispute surrounding whether Norton should have produced certain employment files [DE 31 at 332, n. 52]. It also appears that Norton discussed these witnesses during Perry's deposition, [DE 32 at 598-99] although the Court does not have the full transcript surrounding that testimony, but only limited excerpts. *Id.* In short, the Court does not have enough information to determine whether these witnesses' were timely disclosed and if not, whether the declarations should be stricken under Rule 37 or whether the failure to do so was substantially justified or harmless.   Taking the facts and inferences in a light most favorable to Perry, there is a genuine dispute as to material fact on the element of similarly situated employees, and therefore Court **DENIES** summary judgment on Perry's disabilities discrimination disparate treatment claim.

### B.  Other Arguments

Perry spends time in her response arguing that material facts preclude summary judgment on her retaliation claim.  [DE 31 at 331].  However, no retaliation claim exists; her complaint contained only a single count of "Disability Discrimination" with no discussion of retaliation.  [DE 1 at 4].  Her response in effect seeks to create a retaliation claim.  Norton does not address this claim in its reply.  [DE 32].

Defendants are entitled to "fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Once a case has progressed to the summary judgment stage, the liberal pleading standards available at the motion to dismiss phase are no longer available.  *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 787–88 (6th Cir. 2005).  If a plaintiff

does decide to advance a new legal theory after discovery has concluded, then the correct course is to amend the complaint under Federal Rule of Civil Procedure 15(a). *See id.* at 788. "[A] plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (quoting *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)). Perry is asserting this new legal theory for the first time in response to a summary judgment motion. The Court will thus no further address this argument or asserted theory.

### III.    CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1.    Norton's Motion for Summary Judgment [DE 22] is **DENIED**.

2.    The Court will enter a separate pretrial scheduling order.

Rebecca Grady Jennings, District Judge
United States District Court

March 31, 2023

Cc:    Counsel of Record

29